Good morning. May it please the court. I'm George Pimanti on behalf of the appellant Antonio Bilotta. The ALJ in this case committed three errors, the combination of which warrants a remand to the ALJ for a new hearing. Those errors are one, the ALJ failed to find Mr. Bilotta is illiterate. Two, the ALJ failed to identify and resolve an apparent conflict between the vocational witnesses testimony and the dictionary of occupational titles. And three, the ALJ failed to explain how she reached her conclusions as to Mr. Bilotta's residual functional capacity. Mr. Bilotta completed the second grade quitting to work on the family farm while sporadically attending the third grade in his native land of Italy. Mr. Bilotta's literacy, this is at record pages 516 to 520, in testing by the commissioner's own expert established that his oral language, broad reading, broad written language, and written expression skills were at a kindergarten level or below. And the expert concluded that Mr. Bilotta was illiterate. The ALJ in this case did not reject the opinion that he was illiterate, only that he, she only rejected that he had a severe mental impairment. That's at record page 16. The ALJ specifically stated that she did not include illiteracy in the RFC and oddly stated that it's not a medically determinable impairment. The commissioner defines illiteracy as the a lack found generally in individuals such as Mr. Bilotta who have little or no formal schooling. That's at 20 CFR 404-1564-B1. The commissioner's own expert tested Mr. Bilotta finding that he had a kindergarten or less reading level. The residual functional capacity is the most a person can do at 20 CFR 404-1545-A1. The commissioner goes on to say that he will assess the claimant's residual functional capacity based on all relevant evidence in their case record. The previous, this, this is the case, the ALJ decision that's before the court now is the third ALJ decision. Two prior decisions had been remanded by the appeals council. The commit, excuse me, the previous ALJ in the two remanded decisions found that Mr. Bilotta is illiterate and the ALJ in this decision does not dispute that he is illiterate. She just chose to exclude it from the residual functional capacity even though the commissioner has said the person can do. The most Mr. Bilotta can do includes not being able to read and write in English. The ALJ can't just pretend that that fact does not exist but that appears to be what she's done. We are not asking the court as the district court said to, we're not asking the district court said we are asking the court to reweigh the evidence. We are not asking the court, district court nor this court to reweigh the evidence. We are asking the court to direct the ALJ to weigh the evidence of Mr. Bilotta's illiteracy in the first instance. The ALJ also failed to identify, get an explanation from the vocational witness and resolve an apparent conflict between the vocational witness's testimony and the dictionary of occupational titles. According to the DOT, the three jobs identified by the vocational witness and accepted by the ALJ to deny Mr. Bilotta's claim, those being cleaner to dining room attendant and counter supply worker all have DOT language level of one. Language level one requires the ability to, and this is per the read at a rate of 95 to 120 words per minute, compare similarities and differences between words and between series of numbers. Mr. Bilotta is illiterate with a reading ability of a kindergarten level or less, according to the commissioner's own expert. This court held in the education he received in Italy. I thought he received some rudimentary education there. And then he was a, he's been in this country for a bit of a good bit of time and he worked in a fine job as a tile layer and a tile setter. Wouldn't he have, with this history of work as a skilled laborer, wouldn't he have acquired some proficiency in English during all this time? I'm just wondering in light of his work history and in light of the length of the time that he and his father have been in the country, wouldn't he have acquired some basic proficiency in English? Your honor, we don't dispute, he can speak English, although with a very broken and with a heavy Italian accent. That's not the issue. The issue is if he can read and write English. When he came to the United States, and I believe if I recall correctly, it was 1979. He was approximately 19, 20 years old at the time. He began working for a person named Bruno and Bruno spoke Italian to him and taught him how to lay tile. He did not know how to lay tile when he came to the United States. He had worked on the family farm. Well, I don't understand here because if you're going to be a cleaner, housekeeper, or laundry laborer, these were some of the things that the vocational expert identified as jobs, a counter supply worker, a dining room attendant. I don't understand why that would, why those jobs would necessarily require an ability to read and write English as much as they would require an ability to just speak the language. How does a dining room attendant, for example, need to or a laundry laborer necessarily need to read and write English as long as they can speak the language? Because I think that was what was on the mind of the vocational expert. Well, your honor, you're getting directly to the crux of the problem. We don't know because the ALJ didn't ask as she was required to under Social Security ruling 004P and this court's holdings under Pearson and Thomas. As this court held in Thomas and it cited Pearson, the ALJ has an affirmative duty to make an independent identification of apparent conflicts, which means that the ALJ must recognize and resolve ways in which the of the DOT, even if that conflict is not obvious. And according to the DOT, these jobs require the ability- Excuse me, sir. Judge Diaz got disconnected. I'm going to reconnect it right now. So please stand by for one moment. Okay. Judge Diaz is back. Okay. Judge Diaz, I'm not sure at what point we lost you, but where I was in the discussion with Judge Wilkinson had asked a question about do these jobs, do you have to be able to read and write to do them? That's the vocational witness identified. And that, as I pointed out, that gets to the crux of the error by the ALJ. Because we don't know beyond what the DOT says, the DOT says that the worker has to have the ability to read and recognize 2,500 two and three syllable words and differentiate between the meanings of words. This court addressed a similar situation in Pearson. When discussing that the DOT does not differentiate between various directions in reaching, this court said, although we could guess what these occupations require in reality is the purview of the ALJ to elicit an explanation of the expert. Mr. Piemonte, can I ask about that? So why do we have to gauge what the classifications require in reality? I mean, why can't we just accept the DOT's assertions at face value? Well, Your Honor, because this, we have evidence that Mr. Belota is illiterate. And there's that- Well, maybe you misunderstood my question. What I'm suggesting is that the DOT has indicated that there are certain requirements of literacy that are associated with these jobs. So why isn't that sort of conclusive? Unless, you know, the other side argues that those are maximum requirements and perhaps they're not required for each and every case and each and every job. Do you concede that point that, as Judge Wilkinson pointed out, that a vocational expert or the ALJ in this case could conclude that a particular job might not necessarily need the kinds of writing and reading skills that the broader DOT classification seems to suggest? No, Your Honor, I don't concede that because we don't know. The ALJ is not a vocational expert. The ALJ is directed by the Commissioner's rulings and by this court that there appears to be a conflict. She was required to inquire from that vocational witness whether or not that 2500 reading and writing ability is in fact necessary in those three jobs. The vocational witness very well may have said no, no readings required at all. But we don't know that because she failed to ask the question. And that is the error and that is directly contrary to what the 004P directs her to do and directly contrary to what the Fourth Circuit directed her to do in Pearson. All right. Thank you, Mr. Piemonte. Judge Diaz, if you had the chance to ask the questions that you want, I don't know how much you were not connected with us. If you had the chance to ask the questions you wanted. I have. Thank you. Well, Judge Niemeyer, do you have any questions of Mr. Piemonte? No, I'm fine. Thank you. Okay. Mr. Mervis, let's hear your side of it. Okay. Yes, Your Honor. Thank you. David Mervis on behalf of the Commissioner of Social Security. May it please the Court. I'd submit that this case, because it involves the intersection of a number of different regulations, rulings from the Commissioner, it ends up being, seeming a little bit more complicated than it might, than it is. My plan today, if I could, is to make four points that, to explain to this Court, as we've done in our brief, why the District Court was right to affirm. So the first point here is that, and this is where we started our brief, is that the ALJ's finding that Mr. Bellotta could perform work at the medium exertional level, renders the dispute about this educational level, it renders it moot. And the reason for that is the Commissioner's regulations, regardless of Mr. Bellotta's education level, if he can perform the medium, work at the medium exertional level, which is what the ALJ found here, he's not disabled under the regulations. And we've set out in our brief, just to recap what the evidence shows, and in this case- Mr. Mervis, can I ask about that? So Mr. Piemonte points out that, with respect to this issue, that sort of the key paragraph relating to this medium work capacity misstates the record evidence as to the nature of the x-rays and when they were taken, that the ALJ seemed to rely on to show that there was some degenerative changes in his knees. And that happens more than once in this case. So it troubles me that we're relying, that the conclusion that seems to be untethered to the actual facts in the record. Yes, Your Honor. We fully agree that there is a error in the ALJ's decision as to the date of these x-rays. Now, what we're talking about is page 554, excuse me, 543 of the administrative record. I'll note that it appears that the document was printed in February of 2012. The ALJ identifies in that paragraph on page 19, he identifies the x-rays as occurring in February 2012, and that appears to be the date that the document was printed on 543 of the record. Regardless, what we've argued and what I think is essential here is that the ALJ specifically notes that Mr. Belota's treatment began or he had treatment during the relevant period here in February 2010, and that's what this note is, is a treatment note from February 2010, and that he doesn't have treatment again until March 2012. So that's just right below the paragraph that Your Honor and that Mr. DiMonti is referring to. Right, but the treatment, the statement with respect to there being no treatment records prior to the date last insured follows on the heels of this misstatement of the x-ray, which seems to suggest that the, or at least I don't know, seems to at least reasonably suggest that the ALJ discounted the x-ray, which I assume is a treatment record, right? And if he or she, I don't know if this was a male or female ALJ, discounted that record, which seems to me to be significant, doesn't that call into question the actual conclusion as to the type of work that this claimant was able to do? It doesn't, Your Honor, and the reason why is because the ALJ is a she, she indicates that there's no records from the treatment, from the period here, this 10-month period in 2010, that show significant limitations due to the knee impairment. But isn't the x-ray record a treatment record? It is absolutely a treatment record. So the key And doesn't the x-ray record show impairment? Our position, Your Honor, is that it doesn't show significant impairment beyond what the ALJ has found. So the treatment record indicates, and the x-rays indicate, that Mr. Bellotta has knee arthritis, arthritis in the right knee. He has got off and on knee pain. This is not an indication that he is precluded from performing the medium work that the ALJ found was warranted, was appropriate. And again, the other piece here is we've got opinion evidence from two state agency consultants who looked at the entire record as well and came to the same conclusion. So the ALJ isn't out on her own on this point. She has the benefit of two state agency consultants, Dr. Linster and Dr. Drummond, administrative record 135 to 36 and 150 to 51, who both came to the same conclusion, that Mr. Bellotta had the ability to perform medium work. Again, the ALJ's, the typo in that paragraph that Your Honor refers to on page 19 is regrettable, but it doesn't change the outcome. So let me ask, just to follow up on that, and I apologize for interrupting you, but in isolation, I suppose that might be a reasonable conclusion, but there's also the history about this case. This is the third ALJ that has reviewed this record. Two prior ALJs apparently came to the conclusion that he could only do light work and that he's illiterate. And so now we've got this third ALJ indicating no, and I'd recognize that those two prior opinions aren't binding on the current ALJ, but she's now saying, nevermind, he can do medium work, but she's relying on the face of it, excluding a significant part of the treatment record that might suggest otherwise. So that's my concern about this case, is that it's got a long and tortured history with other decision makers suggesting findings in favor of the claimant. And now we've got this your view of it, typographical errors, Mr. Piamonte's view of it, refusal, not a refusal, but not taking into consideration the entire record, the entire medical record that's available with respect to both his physical condition and his ability to read and write English. So that's my concern. And we certainly understand your Honor's point, your concern that this case does have a long history. But again, as your Honor's aware, and as your Honor indicated, those prior decisions were vacated due to other errors. And the ALJ, she's got a responsibility to review the record as it from other. Is this individual in his 50s or what are we talking about here? That's right, your Honor. We've got a period of time between his 50, I guess he turned 53 during the relevant period here. So it goes. I have some of the same questions that Judge Diaz has. It has a serious problem with the osteoarthritis in his right knee. And that is degenerative. You have osteoarthritis, it doesn't, it generally gets worse over time. And even on the present view of the record, there are substantial limitations on his ability to kneel and to climb. He's lost an ability there. His joints are not in any way flexible or limber. And when you add obesity to it, he's likely to, that's got to put a lot of pressure on his knees because they're going to be carrying a lot of weight. And then in addition, we have this history that Judge Diaz points out. And he's, we can dispute the amount of education, but this is a gentleman who's barely literate. And when you combine his limited facility with English, with his obesity and arthritis, and the limitations that everyone has found on sort of rudimentary motions, it just seems to me, to say this man is not disabled seems to me, I'm just not sure that it adds up. I think between the obesity and the arthritis and the gentleman is in a bad way when you look at it all. We certainly appreciate that, Your Honor. One thing I would make a point of is that this is what we call a closed period. And so we've got a period where Mr. Bellotta had to demonstrate disability before December 31st, 2010. So Your Honor referred to the generative nature of osteoarthritis, and we certainly don't dispute that. But we've got a 10-month period from February of 2010 to the end of the year. And so that's the period that the ALJ is considering. And so whether his condition worsened after that, and in fact, there may be evidence of that. His right knee, I guess, was the impairment during the 10-month period in 2010, but there is indication that his left knee got worse, and maybe his shoulder got worse. But again, those other impairments simply don't play a role here. I know that. But on the other hand, you have to think to yourself, I mean, these things, these hearings and everything go on interminably. And you can almost take judicial notice of the deterioration in someone's joints because of age and wear. And this person has been up and down the ladder, remand after remand after remand. And I wonder if there isn't a doesn't there come a time when some resolution is necessary and not drag him through another set of proceedings. This is just a general concern of mine about this case. Certainly understand that, Your Honor. And our position would be that as unfortunate as it is that it took multiple decisions to get a decision that is defensible, that's what we've got here. So there is no need for another hearing, another decision, because this decision is defensible. It's the findings that the ALJ made are supportive. And again, what we're talking about here is an individual whose burden it is to prove disability. So he had the burden of proving disability during this 10-month period. And this note that we're talking about at 543, it's the record in the administrative record from this period of time. So it indicates that he's got arthritis, and it indicates that he should take a non-steroid anti-inflammatory. And that's it. Can I ask you a question? It looks as if the vocational expert testified that he could do medium jobs and listed a few, and could do some light jobs and listed a few. And the ALJ parroted that in her opinion, basically listing the jobs that he could do, medium jobs and light jobs. And then the next paragraph, the ALJ says, these findings are consistent with the Dictionary of Occupational Titles. But the petitioner here points out that the occupational titles requires a level of education reading up to, what is it, 250 words and that type of thing that have not been demonstrated here. What's your response to that? The ALJ said the vocational expert's testimony is consistent with the DOT, but yet the vocational expert assumed that he couldn't read and write English and pointed out these jobs, yet the dictionary provides that he has to have this level of reading. Sure. Two things on that, Your Honor. The first is that the ALJ's finding, and that's just the page before that on page 20, is that an individual with a marginal education who's able to communicate in English, and there's no dispute about his ability to speak and communicate, so an individual with a marginal education is able to perform this work. And that's what... That's my question. The dictionary uses marginal education, but then when you look to a marginal education, it defines it above the level that's demonstrated for the petitioner here. It defines a marginal education as someone who can read up to 250 words, can, I mean, 90 words per minute, has a vocabulary of two and three-syllable words, a fairly large number, what, 2,500 words or whatever, and that has not been demonstrated. That goes to the crux of my question. It has not been shown that he is marginally educated. Well, I think Your Honor is asking... If I understand your question, Your Honor, there's really two pieces here, because the language development level in the dictionary is indeed what you cited, the 2,500 words, and that's a language level. That's not the marginal education that the ALJ found. The marginal education... Marginal education is a term of art, and it's defined by regulation, right? That's right, Your Honor. And what's the definition of a marginal education? Right. Absolutely, Your Honor. So it's 404-1564-B2. Marginal education is the ability to perform, essentially to perform unskilled work. So it means the ability in reasoning, arithmetic, and language, which is needed to do simple, unskilled types of jobs. That's what the ALJ found. So there's not a finding as to the number of words, the number of reading, the number of words an individual can read. That's in the dictionary. The regulatory definition, and this is crucial here, because the regulatory definition is controlling. So what the ALJ is finding is that this individual is able to... Has the ability in reasoning, arithmetic, and language to perform unskilled work. That's it. That's above illiterate, to be sure, but that's the finding. There's absolutely no conflict between that finding and what the dictionary says about language level or anything else. Mr. Mervis, if we were to find that that finding with respect to literacy was just simply not supported by the record, then how does that impact the analysis that follows? Well, Your Honor, as I indicated at the top, Mr. Belotta under the regulations is not disabled if he can perform medium work and he's illiterate, and he's not disabled if he can perform light work and he has a marginal education. So the ALJ's finding is... There are several different ways, I suppose, would be my answer that the ALJ's finding is supportable, that remand isn't required. Coming at it the other way, this court would have the responsibility or would have to find both the physical finding and the educational finding to be unsupported, because if either one is supported, the ALJ's decision here... Well, I guess what I should say is it doesn't make a difference. If either one is supported, then the other one is moved. But you're relying on that conclusion assumes that there are sufficient numbers of jobs in the national economy for someone who is illiterate for medium work. And is it clear from this record that the vocational expert made that distinction, or were they just assuming that because the ALJ had found that he had a marginal education that that was all that they were looking at in terms of the number of jobs available in the national economy? Sure. And with respect to what the ALJ asked and what the vocational expert responded, there really are two pieces. And so what the ALJ asked is initially an individual with this level of education, and those jobs are identified, the first three jobs that the vocational expert can perform. And then the ALJ asks this additional question, and this is on 62 of the record. So an additional question about whether these jobs can still be performed without a requirement to read or write in English. And the vocational expert adjusts her testimony slightly, swaps out one of the jobs for another. So what we're left with is this another set of three jobs, cleaner, dining room attendant, laundry laborer. And the vocational expert is specifically considering this question of ability in English. So what the vocational expert gives the ALJ is this understanding that there are different jobs that are available for an individual. Let me ask you, are those jobs require 2,500 words of vocabulary? Well, Your Honor, what we can do is we can look at the dictionary's description of the job. Do the dictionary descriptions of these jobs include a vocabulary of 2,500 words? They certainly don't appear to me to do that, Your Honor. Cleaner, it discusses... No, I'm saying that in the dictionary. Well, the response, I guess what I'm trying to do, Your Honor, forgive me. What I'm trying to do is answer your question this way. The dictionary includes a language level of one for each of those jobs. That is undisputed. What I point out is that the dictionary... Let me take my question further. Let me just take it because my question is, okay, the dictionary includes a level of one, which requires 2,500 word vocabulary, right? That's right. And so the vocational expert relied on that definition and did not explain why this man who doesn't have a 2,500 word vocabulary can do those jobs. My biggest problem is the vocational expert assumed that the dictionary was being complied with and even testified it was consistent. Her findings were consistent with the dictionary. But the dictionary says you need 2,500 words. You need to be able to read it 90 words per minute, and the record doesn't support that. What I'd say to that, Your Honor, is this. We know because the regulations explain that per se disabling. I understand that. I want you to answer my specific question. My specific question is, she related two jobs defined in the dictionary, which requires the person to have 2,500 word vocabulary. The vocational expert testified that this man can do those jobs, and she said her testimony was consistent with the dictionary. She did, Your Honor, and I take Your Honor's point. The vocational expert's position here is that these jobs can be performed without the requirement to read or write in English. That's the testimony. And so the question then is whether the ALJ had a reasonable basis to rely on that testimony. Because it is certainly true that every hearing might benefit from an record. I'm reading now at 61 in the record, and she goes through the jobs for both medium and light, and she gives the actual dictionary number for each one of those. Now, the dictionary number for each one of those requires a level one education. And she says that her conclusions are consistent with the dictionary, but yet her conclusions assume he can't read and write, where the dictionary says you have to read and write at a certain level. Your Honor, I would dispute that just in the following way. The question that the vocational expert was asked is then about whether you can do these jobs without the ability to read or write in English. And so then she goes on to say, well, the dictionary doesn't specify English language, but that's what I'm assuming. So the vocational expert is asked about English proficiency, not literacy per se, not ability to read 95 words per minute. And so I don't think the vocational expert's contradicting herself here. I think the jobs don't require the ability to read or write in English. All right. Well, thank you, Mr. Mervis. Judge Niemeyer, do you have any further questions of Mr. Mervis? I don't. Diaz, do you have any further questions? No, thank you. Mr. Piemonte, you have some time for rebuttal. We'll be happy to hear from you. Thank you, Your Honor. And I will get through this as quickly as I can. First, Mr. Mervis said it took them three times to finally get an ALJ decision that was defensible. This decision is not defensible. As Judge Diaz pointed out, it is riddled with errors and misstatements. I'm going to first address the vocational testimony. The issue is not on whether or not the vocational witness said something wrong. The issue is that the ALJ failed on her direct duty as directed under Social Security Ruling 004P and the Fourth Circuit precedent in Pearson to identify and obtain an explanation for an apparent conflict. And there is an apparent conflict. As Judge Niemeyer pointed out, the dictionary requires the ability to read 2,500 two- and three-syllable words and read at a rate at 95 to 120 words per minute. There is an apparent conflict. The ALJ failed to inquire from the vocational witness and get an explanation for that requirement. The ALJ also failed in suddenly finding that Mr. Bellotta— I understood what the dictionary said, about 2,500 words, but I also know from my own experience these jobs do not require that kind of reading and writing ability. So we send it back. We say, okay, there's a discrepancy between what the dictionary says and what the ALJ found. Give us an explanation. Would we be sending it back just for the ALJ to say, yeah, there is a discrepancy, but these jobs do not require, in fact, reading and writing? Because the lowest level that the dictionary uses is level one. They don't have a literacy level. And so the ALJ puts in two sentences and says, okay, we recognize he can't read and write, but he can still do these jobs of laundry helper and the counter making sandwiches and that type of thing. Is that possible? No, sir, because the ALJ is not qualified to make that determination. She is not a vocational expert. She is required to obtain vocational testimony and or other vocational evidence. We don't know what that is. We don't know what those jobs require. The vocational expert was asked, basically, that he couldn't read or write English, right? And gave her opinion based on that assumption, didn't she? There was some dancing around whether or not he could read, but there was no direct inquiry by the ALJ to the vocational witness. Is he capable of doing these three jobs that you have identified because he is illiterate? She never made that inquiry, which is what she's required to do because there is a conflict between what the DOT says is required and what his actual ability is. And we can't make an assumption on evidence or speculate on evidence that's not in the record. And there is no evidence in the record of what amount of reading and writing these jobs actually require. Excuse me. Your Honor, I hope I fully responded to your question. As to the RFC, the ALJ incorrectly, this is at record page 19, incorrectly said Mr. Well, the examination by the commissioner's expert in 2009, which is before the period under consideration, indicated that he had a significantly decreased range of flexion in his right knee, as well as some reduction in his left knee. The commissioner has said in social security ruling 8310, when discussing medium level work, it specifically, the commissioner specifically said flexibility of the knees as well as the torso is important for this activity. So for the ALJ has never explained how she got to medium. Mr. Mervis had to take exception with one of the statements that he made during his argument. He said that the ALJ, that she relied on the non-examining state agency opinion. No, she didn't. We don't know because she didn't say. The ALJ never explains how she concluded that Mr. Bellota is capable of doing medium work when the prior ALJ had twice said he could only do light. The ALJ has misstated and or cherry picked evidence in order to find Mr. Bellota not disabled. In Monroe, this court said the ALJ must form a clear and logical bridge from the evidence to her conclusions. And then this court in Thomas citing its decision in Woods said a proper RFC analysis has three components, one evidence, two logical explanation, and three conclusion. The second component, the ALJ's logical explanation is just as important as the other two. Indeed, our president makes clear that the meaningful review is frustrated when the ALJ goes straight from listing evidence to stating a conclusion. And that's exactly what the ALJ did here. And she didn't even state the evidence correctly, as the commissioner has admitted. And then just very quickly, lastly, the ALJ never even acknowledged Mr. Bellota's obesity that Judge Wilkinson was talking about, let alone do the individualized assessment of the effects of obesity that is called for in FSR 021P, which would directly affect pain and limitations on a weight-bearing joint such as his right knee. All right. Thank you, Mr. Ponte. We appreciate it. And thank you, Mr. Mervis. We can't come down and shake your hands, but we appreciate your argument nonetheless. And I'm going to ask our good courtroom deputy to adjourn court and then reassemble us within five minutes for a conference. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Albert Diaz